JAMES EDWARD MCCONNELL )
and wife KIM MCCONNELL, )
)
      **Plaintiff,** )
)
**vs.** )
)
)     <u>ORDER</u>
)
**WATAUGA COUNTY, et al.,** )
)
      **Defendants.** )
_____)

**THIS MATTER** comes before the Court on a Motion for Summary Judgment by

Defendants Len D. Hagaman, Thomas Hughes, Jaska H. Rominger, Chad Slagle, Jennifer Smith,

Watauga County, Watauga County Department of Social Services, Watauga County Sheriff's

Department, Western Surety Company, and Jessica Weinbarger, (Doc. No. 47).

## I.    BACKGROUND

###    A.    PROCEDURAL BACKGROUND

Plaintiffs James Edward McConnell and his wife, Kim McConnell, filed this action on

October 27, 2017, asserting claims against Defendants in connection with James McConnell's

arrest and subsequent criminal prosecution against him for committing sexual acts on his adopted

son. McConnell was acquitted after a jury trial. Plaintiffs have named the following persons and

entities as Defendants in this action: (1) Watauga County, North Carolina; (2) Watauga County

Department of Social Services ("DSS"); (3) Thomas Hughes, Director of Watauga County DSS

at all relevant times; (4) Jennifer Smith, a Watauga County DSS social worker at all relevant

1

times; (5) Jessica Winebarger, a Watauga County DSS social worker at all relevant times; (6) Chad Slagle, a Watauga County DSS social worker at all relevant times; (7) Len D. Hagaman, the Watauga County Sheriff at all relevant times; (8) Watauga County Sheriff's Department; (9) Jaska H. Rominger, a Watauga County Deputy Sheriff at all relevant times; and (10) Western Surety Company, the surety on Sheriff Hagaman's bond.

Plaintiffs assert a claim under 42 U.S.C. § 1983, alleging that Defendants violated Plaintiffs' federal constitutional rights by way of the arrest and prosecution of McConnell. (Doc. No. 1 at ¶¶ 65-79). Specifically, Plaintiffs allege that Defendants violated Plaintiffs' Fourth Amendment right to be free from unreasonable seizure and false arrest.[1] Plaintiffs also assert a claim under 42 U.S.C. §§ 1985 & 1986, alleging that Defendants conspired to violate their civil rights. (Id. at ¶¶ 80-86). Plaintiffs further assert numerous pendent, state law tort claims, including claims for false imprisonment/arrest, (id. at ¶¶ 87-91); abuse of process/malicious prosecution, (id. at ¶¶ 92-103); negligent hiring, supervision and retention, (id. at ¶¶ 104-111); intentional infliction of emotional distress, (id. at ¶¶ 112-117); and negligent infliction of emotional distress, (id. at ¶¶ 118-120). Plaintiffs also assert a direct claim under the North Carolina Constitution, (id. at ¶¶ 125-133); and a claim against Sheriff Hagaman's official bond under N.C. GEN. STAT. § 58-76-5, (id. at ¶¶ 9, 12). Plaintiffs seek compensatory and punitive damages, including damages for loss of consortium, (id. at ¶¶ 121-24).

Defendants timely filed their Answer, (Doc. No. 24), denying Plaintiffs' material allegations and asserting numerous affirmative defenses, including qualified immunity, public

---

[1] Plaintiffs also cited to the Fifth Amendment's equal protection clause and the Fourteenth Amendment's due process clause in their Complaint, but they have not attempted to argue or prosecute these claims in opposing summary judgment.

officer's immunity, governmental immunity, and the expiration of the applicable statutes of limitation and/or repose.[2]  On January 22, 2019, Defendants filed their summary judgment motion.  (Doc. No. 47).  On March 24, 2019, Plaintiffs filed a response in opposition to the summary judgment motion.  (Doc. No. 80).  Defendants filed a Reply on April 1, 2019.  (Doc. No. 82).

### B.    UNDISPUTED FACTS

After serving as their foster parents, Plaintiffs adopted two brothers, Austin and Alex, then ages 5 and 3, on February 9, 2004.  (K.M. Dep. at 28, 41; Doc. No. 1 at ¶ 17).  In the ensuing years, Austin exhibited behavioral problems, including violence and anger issues, self mutilation/self-destructive behavior, and drug and alcohol use.  In March 2014, Austin was involuntarily committed to Old Vineyard Behavioral Health and thereafter to Holly Hills Behavioral Health.

On July 31, 2014, Austin was admitted to Timber Ridge Center, a Level III treatment camp located in Rowan County.   (K.M. Dep. at 46-47, 65; J.M. Dep. at 81-82, Doc. No. 1 at ¶ 18).  During Austin's admission to Timber Ridge, Nurse Sue Hahn interviewed Austin, at which time Austin reported to Hahn that his father James McConnell had engaged in sexual activity with him in the past.  As required by law, Hahn referred these allegations to the Watauga County DSS.  (Smith Aff. at ¶ 3).  On August 5, 2014, a Rowan County social worker interviewed Austin, who reported that his father had engaged in sexual activity with him several years earlier.

---

[2]  Defendants assert that claims for any acts or omissions by the defendants before October 27, 2014, are barred by the applicable three-year statute of limitations.  Defendants also argue that, to the extent that Plaintiffs allege any improper actions or omissions by the DSS in connection with the adoptions of Alex and Austin, any purported claims thereon are long since barred by the applicable statutes of limitation and repose.  Because the Court has determined that there was no constitutional violation in the first instance, the Court need not address these purported bars.

(Id. at ¶ 4).  After the DSS notified the Sheriff's Office of the allegations on August 5, 2014, Detective Rominger began a criminal investigation.  (Rominger Aff. at ¶ 7).

On August 8, 2014, Rominger and DSS social worker Jennifer Smith, who was conducting a parallel Child Protective Services investigation, interviewed James McConnell. McConnell vehemently denied Austin's allegations.  (J.M. Dep. at 162; Rominger Aff. at ¶ 11; Rominger Dep. at 182-89; Smith Aff. at ¶ 10).  On September 4, 2014, McConnell voluntarily undertook a polygraph examination.  (J.M. Dep. at 15-18).  The SBI polygrapher determined that McConnell's responses indicated a high level of deception.  (Rominger Aff. at ¶ 17, J.M. Dep. at 161).  Immediately thereafter, Rominger conferred with the District Attorney's Office ("D.A."), who instructed Rominger to attempt to obtain the sex toys Austin had described as being used in the incidents with his father.  (Rominger Aff. at ¶ 18; Rominger Dep. at 171-72).

After conferring with attorney Britt Springer, Kim McConnell consented to a search of Plaintiffs' home by Rominger and voluntarily surrendered a bag of sex toys to Rominger.  (K.M. Dep. at 59-62, Rominger Aff. at ¶ 22; Rominger Dep. at 173-79).  That same day, the DSS, with Plaintiffs' consent, instituted a Safety Plan in which James McConnell would have no contact with Alex or Austin, who was still at Timber Ridge.  (K.M. Dep. at 56; Smith Aff. at ¶ 22, Ex. M; Rominger Dep. at 175-76).

At the direction of the D.A., Rominger conducted a recorded forensic interview of Austin[3] on September 11, 2014, during which Austin related several detailed sexual encounters with James McConnell when Austin was between 11 and 13 years old.  (Rominger Aff. at ¶ 26, Ex. A; Rominger Dep. at 88-136, 205-11, 213).  Rominger met the following day with the D.A.,

---

[3] None of the previous interviews of Austin by Sue Hahn, the Rowan County social worker, or Jennifer Smith were recorded.

who reviewed her recorded interview of Austin. The D.A. determined to bring criminal charges against McConnell and instructed Rominger to seek arrest warrants for three counts of sex offenses with a minor and three counts of taking indecent liberties with a minor. (Rominger Aff. at ¶ 27; Rominger Dep. at 146, 158-59).

On September 22, 2014, the DSS filed Juvenile Petitions as to Austin and Alex, alleging that Austin was an Abused, Dependent and Neglected Juvenile and that Alex was a Neglected Juvenile. (Smith Aff. at ¶ 27, Exs. O & P). At the D.A.'s direction, Rominger appeared before Magistrate Carrie Church on October 27, 2014, seeking warrants for McConnell's arrest on three counts of Taking Indecent Liberties with a Child and three counts of Statutory Rape/Sexual Offense With a Child by an Adult.[4] (Rominger Aff. at ¶ 35; Rominger Dep. at 148, 150-52, 232-34). After hearing Rominger's testimony, the Magistrate found that probable cause existed to issue arrest warrants. (Arrest Warrants; Rominger Aff. at ¶ 36, Rominger Dep. at 157). Later that day, a two-day hearing began in Juvenile Court regarding the Juvenile Petitions related to Austin and Alex. Plaintiffs attended this hearing, both represented by counsel. Several witnesses testified, including Austin. Plaintiffs' attorneys vigorously cross-examined Austin and other witnesses called by DSS. (K.M. Dep. at 12-14, J.M. Dep. at 18-30; Hearing Tr.).

After the hearing, Judge Hal Harrison entered an Order on Adjudication and Interim Disposition, in which he found Austin's testimony "to be credible and specific" and concluded that "clear, cogent and convincing facts exist making [Austin] an Abused, Dependent and Neglected Juvenile," and further held "that [Austin] is adjudicated an Abused Juvenile in that [McConnell] permitted, committed and encouraged the commission of a sex or pornography

---

[4] None of the other Defendants, including the Defendant social workers, initiated any criminal proceedings against McConnell.

offense, to-wit: N.C.G.S. § 14-202.1 – 'indecent liberties' with or upon [Austin] in violation of criminal law, to wit: N.C.G.S. 7B-101(d)."   (Order on Adjudication and Interim Disposition as to Austin).[5]   On October 28, 2014, James McConnell surrendered himself at the Watauga County Courthouse.   (K.M. Dep. at 62-63, J.M. Dep. at 46-47; Rominger Aff. at ¶ 38).   He appeared before Judge Warren Hughes, who set a secured bond of $500,000.   McConnell was detained in the Watauga County Detention Center until December 15, 2014, when he was released on bond. (K.M. Dep. at 64, Doc. No. 1 at ¶ 38).

On November 3, 2014, a Grand Jury indicted McConnell on three counts of Taking Indecent Liberties with a Child and three counts of Statutory Rape/Sexual Offense with a Child by an Adult.   (J.M. Dep. at 50, 71; Rominger Aff. at ¶ 40).[6]   McConnell's criminal trial began on June 13, 2016, in Watauga County Criminal Superior Court.   Following the close of the State's case, which included testimony by Austin, the defense made a motion to dismiss, which was denied.   (Trial Trans., Vol. II at 319-22).   The defense made a second motion to dismiss at the close of the defense case, which was also denied.   (Trial Trans., Vol. II at 425-26).   After deliberating for two hours, the jury acquitted McConnell of all charges.   (J.M. Dep. at 61; Trial Trans., Vol. II at 450-51).   Plaintiffs then filed this action against the various Defendants.

## II.   STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   FED. R. CIV. P.

---

[5]  In a separate Order applicable to Alex's case, the Court adjudicated Alex as a Neglected Juvenile and directed that he should remain in his mother's custody, provided that the McConnells complied with the safety plan in place with the DSS that McConnell have no contact with Alex.   (See Order on Adjudication and Interim Disposition as to Alex).

[6]  At the D.A.'s direction, new indictments were sought and issued from the Grand Jury in January 2016.   (Rominger Aff. at ¶ 48).

56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S. Ct. 2658, 2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

III.    DISCUSSION

   A. PLAINTIFFS' SECTION 1983 CLAIMS AGAINST DEFENDANTS IN THEIR INDIVIDUAL LIABILITIES

Plaintiffs bring various constitutional claims against Defendants in their individual capacities through Section 1983 based on Plaintiffs' contentions that James McDonnell's arrest and subsequent trial was not based on probable cause. In response, Defendants raise the defense of qualified immunity. For the following reasons, the Court finds that Plaintiffs' Section 1983 claims fail because Defendants did not violate Plaintiffs' constitutional rights. In any event, even if there was a constitutional violation, Defendants are entitled to qualified immunity.

Defendants first contend that there was no violation of Plaintiffs' constitutional rights because probable cause existed to arrest James McConnell. The Court agrees. A case involving an arrest, such as this one, implicates the Fourth Amendment's prohibition against "unreasonable…seizures." U.S. Const. Amend. IV.[7] "The Fourth Amendment prohibits law enforcement officers from making unreasonable seizures, and a seizure of an individual effected without probable cause is unreasonable." Brooks v. City of Winston-Salem, 85 F.3d 178, 183 (4th Cir. 1996). Conversely, a seizure effected with probable cause is reasonable as a matter of law; thus, the existence of probable cause defeats a claim of "unreasonable seizure" under the Fourth Amendment. See Street v. Surdyka, 492 F.2d 368, 372-73 (4th Cir. 1974). "The Constitution does not guarantee that only the guilty will be arrested." Baker v. McCollan, 443 U.S. 137, 145 (1979).

If probable cause exists when an officer seeks issuance of a warrant, then the officer's action in seeking the warrant and the subsequent arrest do not violate the Fourth Amendment.[8]

_____

[7] A Section 1983 "malicious prosecution" claim "is properly understood as a Fourth Amendment claim for unreasonable seizure which incorporates certain elements of the common law tort." Lambert v. Williams, 223 F.3d 257, 261-62 (4th Cir. 2000).

[8] Furthermore, if an arrest is reasonable – i.e., supported by probable cause – then the continuing pretrial seizure of a criminal defendant is also reasonable. See Brooks, 85 F.3d at 184; Taylor v. Waters, 81 F.3d 429, 435-436 (4th Cir. 1996).

Thus, an officer who arrests a suspect pursuant to a warrant does not violate the Fourth Amendment unless that officer did not possess probable cause to seek the warrant.  Porterfield v. Lott, 156 F.3d 563, 570 (4th Cir. 1998); Brooks, 85 F.3d at 184 n.7.

"Probable cause is determined from the totality of the circumstances known to the officer at the time of the arrest."  Brown v. Gilmore, 278 F.3d 362,367 (4th Cir. 2002); United States v. Garcia, 848 F.2d 58, 59-60 (4th Cir. 1988); Illinois v. Gates, 462 U.S. 213, 230-32 (1983). Probable cause is a commonsense, nontechnical concept that "deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Ornelas v. United States, 517 U.S. 690, 695 (1996).  The circumstances are weighed "not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement."  United States v. Dickey-Bey, 393 F.3d 449, 453 (4th Cir. 2004) (quoting Gates, 462 U.S. at 232).  Under this "pragmatic, common sense approach," courts "defer to the expertise and experience of law enforcement officers …."  Dickey-Bey, 393 F.3d at 453.

As the Supreme Court has recently reiterated, "probable cause is not a high bar."  District of Columbia v. Wesby, 138 S. Ct. 577, 586 (2018).  "While probable cause requires more than 'bare suspicion,' it requires less than that evidence necessary to convict."  United States v. Gray, 137 F.3d 765, 769 (4th Cir. 1998); Wong Sun v. United States, 371 U.S. 471, 479 (1963).  The arresting officer's belief need not be correct or even more likely true than false.  Texas v. Brown, 460 U.S. 730, 742 (1983).  Indeed, the Fourth Circuit has specifically rejected the argument that "probable cause means more likely than not, [more than] 50/50," and made it clear that "the probable-cause standard does not require that the officer's belief be more likely true than false." United States v. Humphries, 372 F.3d 653, 660 (4th Cir. 2004).  Therefore, a reasonable officer may have probable cause to believe a suspect has committed a crime even if the officer's belief

is not more likely true than false. "Probable cause determinations are … preliminary and tentative." Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 11 (1st Cir. 2004). Since probable cause does not even require a showing that guilt is more probable than not, the probable cause stage is not the stage where the ultimate question of guilt or innocence is determined. Instead, the determination of a suspect's guilt or innocence is reserved for trial, where it is placed in the hands of the judge and the jury. Baker v. McCollan, 443 U.S. 137, 146 (1979); United States v. Colkley, 899 F.2d 297, 302 (4th Cir. 1990). Thus, it is irrelevant to the probable cause analysis whether the suspect is later acquitted. Michigan v. DeFillippo, 443 U.S. 31, 36 (1979).

In determining whether probable cause exists, courts are to limit their consideration to the facts and circumstances "known to the officer at the time of the arrest." Taylor, 81 F.3d at 434; Gomez v. Atkins, 296 F.3d 253, 262 (4th Cir. 2002); United States v. Al-Talib, 55 F.3d 923, 931 (4th Cir. 1995). Thus, evidence that was unknown to the officer at the time of the arrest is irrelevant to the determination of whether probable cause existed to arrest the suspect. See e.g., Reynolds v. Jamison, 488 F.3d 756, 765 (7th Cir. 2007); Xing Qian v. Kautz, 168 F.3d 949, 953-54 (7th Cir. 1999). In order "[t]o determine whether an officer had probable cause to arrest an individual, [courts] examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable officer, amount to probable cause." Maryland v. Pringle, 540 U.S. 366, 371 (2003).

The Court first finds that probable cause existed for authorities to arrest and charge James McConnell. As recognized by the Supreme Court, "[c]hild abuse is one of the most difficult crimes to detect and prosecute, in large part because there often are no witnesses except the victim." Pennsylvania v. Ritchie, 480 U.S. 39, 60 (1987). Thus, many child sexual abuse cases rely chiefly, if not solely, on the alleged victim's statements. Here, Austin reported to a nurse,

two social workers, and Rominger that James McConnell had engaged in unlawful sexual acts with him several years earlier.  It is beyond dispute that statements by a victim, including a victim of sexual abuse, are sufficient to establish probable cause.  In <u>Torchinsky v. Siwinski</u>, the Fourth Circuit held:

> It is surely reasonable for a police officer to base his belief in probable cause on a victim's reliable identification of his attacker.  <u>See</u> <u>McKinney v. George</u>, 726 F.2d 1183, 1187 (7th Cir. 1984).  Indeed, it is difficult to imagine how a police officer could obtain better evidence of probable cause than an identification by name of assailants provided by a victim, unless, perchance, the officer were to witness the crime himself.

942 F.2d 257, 262 (4th Cir. 1991); <u>see also</u> <u>Barham v. Town of Greybull</u>, 483 Fed. Appx. 506, 507 (10th Cir. 2012) (unpublished) (holding that probable cause existed to support arrest warrant affidavit and rejecting argument that officer failed to conduct an adequate investigation into minor's claims of sexual assault before preparing affidavits); <u>Ahlers v. Schebil</u>, 188 F.3d 365, 370-71 (6th Cir. 1999) (an alleged victim's accusation that she had been sexually assaulted, "standing alone, was sufficient to establish probable cause"); <u>Ruff v. Board of Regents of Univ. of New Mexico</u>, No. 16-cv-1140, 2018 WL 565705 (D.N.M. Jan. 24, 2018) (unpublished) (finding that "statements [of child sexual assault victim] alone were sufficient to create probable cause").

Here, Rominger knew that Austin had reported to a nurse and two social workers that James McConnell had engaged in unlawful sexual acts with him.  As discussed, Rominger interviewed Austin, during which he reported several specific instances in which his father had engaged in unlawful sexual acts with him.[9]  Rominger conferred with the D.A. regarding the

---

[9]  In addition to Austin's accusations, McConnell had also failed a polygraph, which provided additional grounds to believe that probable cause existed.  <u>Gomez</u>, 296 F.3d at 264 n.8. Rominger also obtained various sex toys from Plaintiffs' residence which matched those

evidence she had gathered, and the D.A. determined that probable cause existed and directed

Rominger to seek warrants for McConnell's arrest on specific charges.  A grand jury

subsequently indicted McConnell.  An indictment by a grand jury "conclusively determines the

existence of probable cause." Gerstein v. Pugh, 420 U.S. 103, 118 n.19 (1975); Rodriguez v.

Ritchey, 556 F.2d 1185, 1190-91 (5th Cir. 1977).  Thus, McConnell's indictment establishes the

existence of probable cause.[10]  In sum, probable cause existed for McConnell's arrest, which is

fatal to Plaintiffs' claims.

The gist of Plaintiffs' argument, in responding to the summary judgment motion, is that--

given Austin's background and history of lying as well as the fact that parts of Austin's story

contained inconsistencies—Defendants should all have known that Austin fabricated the entire

story about his father molesting him.  As Defendants explain in their Reply, however, the fact

that McConnell was acquitted by a jury does not mean there was no probable cause to begin

with.  Moreover, the persons in this matter who found probable cause were aware of the

inconsistencies in certain dates and of Austin's prior troubles, including lying in his past.   Still,

Austin's statements were obviously considered credible enough by numerous persons to bring

charges against McConnell.

The Court further notes that, in their response brief, Plaintiffs cite to "facts" that they

assert were "known" to the various Defendants when the charges were brought against

McConnell, including various counseling records from mental health facilities where Austin had

been treated, which Plaintiffs assert would have led a reasonable person to conclude that Austin

---

described by Austin.

[10]  Plaintiffs do not contend that Rominger knowingly provided any false testimony.  (J.M. Dep.
at 40).

had fabricated the entire story of sexual abuse against his father. Defendants point out in their Reply, however, that many of these facts were not known to Defendants, including Rominger. In any event, as Defendants note, despite that Defendants were aware of Austin's troubled past, various inconsistencies in his story, and other factors that could negate a finding that his story was his credible, several persons nevertheless found that Austin's story was, in fact, credible. This was enough to establish probable cause. Furthermore, contrary to Plaintiffs' assertion, the issue of whether probable cause existed is a question of law, not an issue for the jury to decide. Wesby, 138 S. Ct. at 586 (finding as a matter of law that plaintiffs' arrest was supported by probable cause); Park v. Shiflett, 250 F.3d 843, 849-50 (4th Cir. 2001) (holding that "[w]hether given facts constitute probable cause is a legal determination which is reviewed de novo") (citing Gray, 137 F.3d at 770). In sum, for the reasons stated herein, Defendants are entitled to summary judgment as to Plaintiffs' claim of a Fourth Amendment violation based on lack of probable cause.

The Court next finds that, even if probable cause did not exist, Defendants are still entitled to qualified immunity. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Officials who are sued for civil damages are entitled to qualified immunity unless (1) the complaint sufficiently alleges a violation of a constitutional right, and (2) the right at issue, defined at the appropriate level of generality, was "clearly established" at the time of the alleged misconduct. Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs., 597 F.3d 163, 169 (4th Cir. 2010). It is within the court's discretion to decide "which of the two prongs of the qualified immunity analysis should be

13

addressed first in light of the circumstances in the particular case at hand." Id. (quoting Pearson, 555 U.S. at 236).

A constitutional right is clearly established where "its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Hope v. Pelzer, 536 U.S. 730, 739 (2002) (internal quotation marks omitted). "[I]f there is a legitimate question as to whether an official's conduct constitutes a constitutional violation, the official is entitled to qualified immunity." Martin v. Saint Mary's Dep't of Soc. Servs., 346 F.3d 502, 505 (4th Cir. 2003) (internal quotation marks omitted).

In analyzing qualified immunity, the relevant inquiry is whether a reasonable officer possessing the same information could have believed that probable cause existed.[11]  In making this inquiry, the issue is not whether probable cause existed; rather, the issue is whether arguable probable cause existed.  As the Supreme Court has instructed in Malley v. Briggs, 475 U.S. 335, 341, 346 n.9 (1988), an officer is entitled to qualified immunity if "officers of reasonable competence could disagree" on the issue of probable cause.  See also Porterfield, 156 F.3d at 568.  If arguable probable cause exists—even if actual probable cause is not present—the officer is entitled to qualified immunity.  See e.g., Keil v. Triveline, 661 F.3d 981, 986-87 (8th Cir. 2011).  Here, even assuming that probable cause did not exist, Defendants are nevertheless entitled to qualified immunity because, at a minimum, arguable probable cause existed to bring

_____

[11]  In determining qualified immunity, the Court must consider the particular facts of the case and the totality of the circumstances in determining whether the law was so clearly established that a reasonable officer or defendant would not have found probable cause.  Plaintiffs have posed the qualified immunity issue too broadly, stating that the clearly established law is the "constitutional right to be free from arrest and prosecution without probable cause."  (Doc. No. 80 at 25).  Here, the issue is whether, under the particularized facts of this case, Rominger violated Plaintiffs' federal constitutional rights by seeking a warrant for McConnell's arrest.  As Defendants argue, it is clear that she did not.

charges against McConnell. In other words, even assuming Rominger did not possess probable cause, this is not a case in which "no officer of reasonable competence would have requested the warrant." Malley v. Briggs, 475 U.S. at 346 n.9.

Moreover, in the juvenile court, after hearing Austin testify and be vigorously cross-examined, Judge Harrison found that "clear, cogent and convincing facts exist[ed] . . . that [McConnell] permitted, committed and encouraged the commission of a sex or pornography offense, to-wit: N.C.G.S. § 14-202.1 indecent liberties with or upon [Austin] in violation of criminal law, to wit: N.C.G.S. 7B- 101(d)." This finding of "clear, cogent and convincing evidence" (a far higher standard than probable cause) that McConnell committed sexual offenses establishes, at a minimum, that there was arguable probable cause. Moreover, the D.A. who instructed Rominger to seek warrants for McConnell's arrest and to testify before the Grand Jury, and who had repeated personal interviews with Austin, determined to proceed to trial.[12] Finally, as Defendants note, it is highly significant that the judge presiding over McConnell's criminal trial twice denied his motions to dismiss the charges against him. In doing so, the trial court found that there was substantial evidence of each essential element of the offense charged and that McConnell was the perpetrator of the offense. See North Carolina v. Garcia, 358 N.C. 382, 412, 597 S.E.2d 724, 746 (2004). Thus, after hearing all the evidence plus counsels' arguments, the judge ruled that there was substantial evidence sufficient to convict McConnell. Given the ruling that there was evidence sufficient to convict McConnell, the judge's ruling establishes that there was arguable probable cause; thus, Defendants are entitled to qualified

---

[12] Rule 3.8 of the North Carolina Rules of Professional Conduct, Special Responsibilities of a Prosecutor, provides that "the prosecutor in a criminal case shall: (a) refrain from prosecuting a charge that the prosecutor knows is not supported by probable cause."

immunity.

In sum, Plaintiffs have not raised a genuine issue of disputed fact on summary judgment as to whether Defendants violated Plaintiffs' Fourth Amendment rights. Alternatively, Defendants are entitled to qualified immunity as to Plaintiffs' Section 1983 Fourth Amendment claim. Thus, the individual Defendants are entitled to summary judgment as to Plaintiffs' Section 1983 Fourth Amendment claim.

### B. PLAINTIFFS' SECTION 1983 CLAIMS AGAINST SHERIFF HAGAMAN AND WATAUGA COUNTY

Plaintiffs' Section 1983 claims against Sheriff Hagaman (sued solely in his official capacity) and Watauga County appear to be asserted under multiple theories, including theories of respondeat superior, a Monell theory of a purported unlawful policy or custom, and supervisory liability/failure to train. Because the Court has found that Defendants are not liable in their individual capacities on Plaintiffs' Fourth Amendment claim, it follows that there can be no liability as to Sheriff Hagaman or Watauga County as to any of Plaintiffs' theories.[13] See e.g., Hinkle v. City of Clarksburg, 81 F.3d 416, 420 (4th Cir. 1996). In sum, for the reasons stated herein, Defendants Sheriff Hagaman and Watauga County are also entitled to summary judgment on Plaintiffs' Section 1983 claims against them.

### C. PLAINTIFFS' SECTION 1985 & 1986 CLAIMS AGAINST DEFENDANTS

The court next addresses Plaintiff's Section 1985 and Section 1986 claims. To establish a Section 1985 violation, a plaintiff must "demonstrate with specific facts that the defendants

---

[13] In any event, as Defendants note, there is no Section 1983 liability based on respondeat superior, nor have Plaintiffs pointed to an official custom or policy that was effectuated in violation of Plaintiffs' constitutional rights. Plaintiffs' state law tort claim for negligent hiring/supervision likewise fails for the same reasons.

were 'motivated by a specific class-based, invidiously discriminatory animus to deprive the plaintiff[] of the equal enjoyment of rights secured by the law to all.'" Francis v. Giacomelli, 588 F.3d 186, 196-97 (4th Cir. 2009). As to the Section 1985 claim, Plaintiffs have failed to present any evidence to show that Defendants did anything other than fulfill their duties either as law enforcement officers or social workers in responding to claims of sexual abuse of a minor. Plaintiffs' Section 1986 claim likewise fails, as neither Sheriff Hagaman nor Watauga County could possibly prevent a "wrong[] conspired to be done" that simply did not exist. Moreover, this claim is barred by the applicable one-year statute of limitations. 42 U.S.C. § 1986. For these reasons, Defendants are entitled to summary judgment as to Plaintiffs' Section 1985 and Section 1986 claims.

## IV. PLAINTIFFS' STATE LAW TORT CLAIMS

### A. PUBLIC OFFICIAL IMMUNITY AND OFFICIAL CAPACITY IMMUNITY

In their summary judgment motion, as to Plaintiffs' state tort claims, Defendants first contend that various named Defendants enjoy either public official immunity (to the extent that public official Defendants are being sued individually), or governmental immunity (to the extent defendants are being sued in their official capacities). For the following reasons, the Court agrees that both types of immunity apply to shield Defendants from liability as to Plaintiffs' state law tort claims.

Public officers engaged in governmental duties involving the exercise of judgment and discretion may only be held liable if their actions were "corrupt or malicious." Smith v. Hefner, 235 N.C. 1, 7, 68 S.E.2d 783, 787 (1952). Law enforcement activities are clearly such duties. Hare v. Butler, 99 N.C. App. 693, 698, 394 S.E.2d 231, 235 (1990). Likewise, social workers

are also cloaked in public officer's immunity.  Hunter v. Transylvania Cnty. DSS, 207 N.C. App. 735, 701 S.E.2d 344 (2010); Dalenko v. Wake Cnty. DSS, 157 N.C. App. 49, 578 S.E.2d 599 (2003).  It is well established that a public officer will not lose public officer's immunity if she acts wantonly or recklessly, or if her judgment is "misguided," so long as she acts without malicious or malevolent intent.  Grad v. Kaasa, 312 N.C. 310, 321 S.E.2d 888 (1984).

For purposes of the public officer's immunity analysis, "[a] defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another."  Grad, 312 N.C. at 313, 321 S.E.2d at 890-91.  Further, courts must presume "that a public official in the performance of his official duties 'acts fairly, impartially, and in good faith and in the exercise of sound judgment or discretion, for the purpose of promoting the public good and protecting the public interest.'"  Lunsford v. Renn, 207 N.C. App. 298, 310, 700 S.E. 2d 94, 101 (2010).  The presumption can only be rebutted by affirmative evidence and "[e]very reasonable intendment will be made in support of the presumption."  Huntley v. Potter, 255 N.C. 619, 628, 122 S.E.2d 681, 687 (1961).  "[T]he burden is on [plaintiff] to overcome the presumption by competent and substantial evidence."  In re Annexation Ordinance No. 300-X, 304 N.C. 549, 551, 284 S.E.2d 470, 472 (1981).

Here, it cannot be reasonably argued that Defendants' acts were that "which a man of reasonable intelligence would know to be contrary to his duty," particularly when a magistrate, a Grand Jury, the D.A., and two judges determined that there was probable cause to believe that McConnell committed the offenses for which he was charged and arrested, and where the Juvenile District Court reviewed, approved, and oversaw the actions of the DSS.  Moreover, Plaintiffs cannot overcome the presumption that Defendants acted in good faith.  Thus, to the

extent that the named Defendant DSS social workers and Defendant Rominger have been sued in their individual capacities, they enjoy public officer immunity.

Next, as to Plaintiffs' state law tort claims against Defendants in their official capacities, "official capacity" suits are merely another way of pleading an action against the governmental entity of which the individual is an agent.  Moore v. City of Creedmoor, 345 N.C. 356, 367, 481 S.E.2d 14, 21 (1997).  Plaintiffs' official capacity state law tort claims fail because there has been no waiver of governmental immunity.  "The doctrine of sovereign immunity bars actions against public officials sued in their official capacities.  Sheriffs and deputy sheriffs are considered public officials for purposes of sovereign immunity."  Phillips v. Gray, 163 N.C. App. 52, 56-57, 592 S.E.2d 229, 232 (2004).  Services provided by a local DSS are likewise governmental functions to which governmental immunity applies.  Hare, 99 N.C. App. at 699, 394 S.E.2d at 235; Whitaker v. Clark, 109 N.C. App. 379, 381, 427 S.E.2d 142, 143 (1993).  Governmental officials are entitled to governmental immunity unless they waive it through the purchase of insurance; however, any waiver is limited solely to the extent of insurance coverage.  Satorre v. New Hanover Cnty. Bd. of Comm'rs, 165 N.C. App. 173, 176, 598 S.E.2d 142, 144 (2004) (citing N.C. GEN. STAT. § 153A-435(a)).  "If the insurance policy does not indemnify the defendant against the [] acts alleged in plaintiff's complaint, defendant has not waived its sovereign immunity."  Doe v. Jenkins, 144 N.C. App. 131, 135, 547 S.E.2d 124, 127 (2001).

The events about which Plaintiffs complain took place between August 2014 and June 2016.  The only liability insurance coverage that Defendants had during this period was via contracts between Watauga County and the North Carolina Association of County Commissioners Liability and Property Pool.  (Geouque Aff., Exs. A & B).  These contracts clearly provide that they neither "cover claims against a Covered Person against which the

Covered Person may assert sovereign and/governmental immunity in accordance with North

Carolina law" nor apply to "any claim or Suit as to which a Covered Person is entitled to

sovereign immunity or governmental immunity under North Carolina law."[14]  This language has

repeatedly been held to preserve governmental immunity.  See, e.g., Evans v. Chalmers, 703

F.3d 636, 656 (4th Cir. 2012); Owen v. Haywood Cnty., 205 N.C. App. 456, 461, 697 S.E.2d

357, 360 (2010); Earley v. Haywood Cnty. DSS, 204 N.C. App. 338, 342, 694 S.E.2d 405, 409

(2010).  Thus, Plaintiffs' official capacity state law tort claims are barred by governmental

immunity.

### B.    THE MERITS OF PLAINTIFFS' STATE LAW TORT CLAIMS

Defendants also argue in their summary judgment motion that, notwithstanding the

application of public official or governmental immunity, Defendants are entitled to summary

judgment as to the merits of Plaintiffs' state law tort claims.  For the following reasons, the Court

agrees that even if Defendants did not enjoy public and/or governmental immunity, Defendants

would still be entitled to summary judgment on the merits of Plaintiffs' state law tort claims.

### 1.  PLAINTIFFS' CLAIM FOR MALICIOUS PROSECUTION

A claim for malicious prosecution under North Carolina law requires a plaintiff to

establish four elements: "(1) the defendant initiated the earlier proceeding; (2) malice on the part

of the defendant in doing so; (3) lack of probable cause for the initiation of the earlier

proceeding; and (4) termination of the earlier proceeding in favor of the plaintiff."  Beroth Oil

Co. v. Whiteheart, 173 N.C. App. 89, 99, 618 S.E.2d 739, 746 (2005).  As previously shown,

McConnell's arrest was supported by probable cause, which is fatal to Plaintiffs' claim.

---

[14]  See, e.g., Section II.F., p. 3 of 13; Section II.J., p. 4 of 13; Section V.C., p. 2, Section VI.C., p. 2 of Exhibits A & B to Mr. Geouque's Affidavit.

Moreover, there is no competent evidence that Rominger acted out of any malice toward Plaintiffs. (K.M. Dep. at 120-21; J.M. Dep. at 148-49; Rominger Aff. at ¶ 66). Indeed, an arrest supported by probable cause is not malicious as a matter of law. Anderson v. Caldwell Cnty. Sheriff's Office, 524 Fed. Appx. 854, 863 (4th Cir. 2013) (unpublished). In sum, Defendants are entitled to summary judgment as to Plaintiffs' malicious prosecution claim.

## 2. PLAINTIFFS' FALSE ARREST/FALSE IMPRISONMENT CLAIMS

Next, to establish a claim for false arrest/imprisonment, a plaintiff must show: "(1) the illegal restraint of plaintiff by defendant, (2) by force or implied threat of force, and (3) against Plaintiffs' will." Rousselo v. Starling, 128 N.C. App. 439, 449, 495 S.E.2d 725, 732 (1998). It is well settled that probable cause is an absolute bar to a claim for false arrest or false imprisonment. Williams v. City of Jacksonville Police Dep't, 165 N.C. App. 587, 596, 599 S.E.2d 422, 430 (2004). Because McConnell's arrest was supported by probable cause, this claim fails, and Defendants are therefore entitled to summary judgment as to this claim.

## 3. PLAINTIFFS' ABUSE OF PROCESS CLAIM

Next, as to Plaintiffs' abuse of process claim, "[t]he distinction between an action for malicious prosecution and one for abuse of process is that malicious prosecution is based upon malice in causing the process to issue, while abuse of process lies for its improper use after it has been issued." Barnette v. Woody, 242 N.C. 424, 431, 88 S.E.2d 223, 228 (1955). Two elements must be proven to establish a claim for abuse of process: (1) that the defendant had an ulterior motive to achieve a collateral purpose not within the normal scope of the process used, and (2) that the defendant committed some act that is a "malicious misuse or misapplication of that process after issuance to accomplish some purpose not warranted or commanded by the writ." Stanback v. Stanback, 297 N.C. 181, 200, 254 S.E.2d 611 (1979), overruled on other grounds by

21

<u>Dickens v. Puryear</u>, 302 N.C. 437, 276 S.E.2d 325 (1981).

Defendants are entitled to summary judgment as to Plaintiffs' abuse of process claim. Plaintiffs have conceded that they have no evidence that Defendants had any ulterior motive with respect to the charges brought against James McConnell, or that Defendants' investigations and prosecution of McConnell were a malicious misuse of the criminal proceedings or the proceedings in juvenile court.   (J.M. Dep. at 141; K.M. Dep. at 100-05, Smith Aff. at ¶ 32; Rominger Aff. at ¶ 66; Hagaman Aff. at ¶ 10; Hughes Aff. at ¶ 5; Slagle Aff. at ¶ 8).

### 4.  PLAINTIFFS' CLAIMS FOR INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

Next, as to Plaintiffs' claim for intentional infliction of emotional distress, the North Carolina Supreme Court has established a three-prong test for determining whether conduct arises to the level of intentional infliction of emotional distress ("IIED"): (1) extreme and outrageous conduct, (2) which is intended to cause, and (3) does cause severe emotional distress to another.  <u>Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A.</u>, 327 N.C. 283, 304, 395 S.E.2. 85, 97 (1990)).  Whether the conduct alleged is sufficiently extreme and outrageous to support an IIED claim is initially a question of law for the court.  <u>Lenins v. K-Mart Corp.</u>, 98 N.C. App. 590, 599, 391 S.E.2d 843, 848 (1990).

Defendants are entitled to summary judgment as to Plaintiffs' IIED claim.  First, Plaintiffs have not shown that Defendants engaged in "extreme and outrageous" conduct.  As the Court has discussed at length, Rominger conducted a good-faith investigation into allegations made by Austin, seeking a warrant for McConnell's arrest only after conferring with the D.A. and being directed to do so.  Likewise, the Defendant social workers merely fulfilled their duties in protecting the welfare and safety of Austin and Alex.  As for the second element, Plaintiffs

22

have not shown that Defendants took any action with the intent to cause Plaintiffs "severe emotional distress." Third, not only must the alleged wrongdoing be "extreme," it must also cause severe emotional injury. For purposes of an IIED claim, the North Carolina Supreme Court defines "severe emotional distress" as "any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." Waddle v. Sparks, 331 N.C. 73, 83, 414 S.E.2d 22, 27 (1992). Plaintiffs concede that neither of them have been diagnosed with, or treated for, any mental or emotional condition.[15] (K.M. Dep. at 116-17, J.M. Dep. at 136-37, 144-145). Thus, Plaintiffs' IIED claim fails as a matter of law.

Plaintiffs' claim for negligent infliction of emotional distress ("NIED") likewise fails. To establish a claim for NIED, a plaintiff must allege and prove that: (1) the defendant negligently engaged in conduct; (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress or mental anguish; and (3) the conduct did in fact cause the plaintiff severe emotional distress. Johnson v. Ruark Obstetrics, 327 N.C. at 304, 395 S.E.2d at 97. Here, Plaintiffs have not raised a genuine issue of disputed fact as to Plaintiffs' NIED claim. That is, Plaintiffs have not shown that Defendants' conduct was negligent, that it reasonably foreseeable that Defendants' conduct, which was lawful, would cause them severe emotional distress, or that Plaintiffs actually suffered any severe emotional distress. (K.M. Dep. at 116-17, J.M. Dep. at 136-37, 144-45). In any event, as to both Plaintiffs' claims for NIED and IIED, as Defendants point out, because McConnell's arrest was supported by probable cause, and because

---

[15] Even if Plaintiffs could establish the third element, the IIED claim still fails because Plaintiffs have not raised a genuine issue of disputed fact as to the first two elements.

Defendants' conduct was likewise lawful, Plaintiffs' NIED and IIED claims both fail.  See, e.g., Best v. Duke Univ., 337 N.C. 742, 752, 448 S.E.2d 506, 512 (1994) (holding that the defendant officer was not liable for negligent infliction of emotional distress when the plaintiff's arrest was supported by probable cause).

### C.    PLAINTIFFS' STATUTORY CLAIM AGAINST SHERIFF'S HAGAMAN'S OFFICIAL BOND

Next, the Court addresses Plaintiffs' statutory claim against Sheriff Hagaman's bond. N.C. GEN. STAT. § 58-76-5 provides a claim against a sheriff's official bond in addition to any state common law cause of action a plaintiff might have.  Rominger v. Barker, 129 N.C. App. 576, 585, 502 S.E.2d 1, 6 (1998).  However, to prevail on a statutory claim against a sheriff's official bond, a plaintiff must be able to prove the elements of the underlying common law tort claims.  Id.  Because Plaintiffs' state law tort claims all fail on their merits, this claim likewise fails.  Thus, Defendants are entitled to summary judgment as to Plaintiff's statutory claim against Sherriff Hagaman's official bond.

### D.    PLAINTIFFS' NORTH CAROLINA CONSTITUTIONAL CLAIM

Finally, the Court addresses Plaintiffs' claims under the North Carolina Constitution. Plaintiffs purport to bring claims of violations of the following provisions in the North Carolina Constitution: Article 1, Section 19, the right to be free from deprivation of life, liberty, property or privilege, and equal protection under the law; Article 1, Section 20, the right to be free from unreasonable search and seizure; Article 1, Section 21 the right to be free from unlawful restraints upon personal liberty; and Article 1, Sections 35 and 36, the retention of rights necessary to guarantee and preserve the blessings of liberty.  A plaintiff may pursue a direct action under the North Carolina Constitution only where the plaintiff lacks a remedy under state

law adequate to redress the alleged violation.[16]  Craig ex rel. Craig v. New Hanover Cnty. Bd. of Educ., 363 N.C. 334, 338, 678 S.E.2d 351, 354 (2009); Corum v. Univ. of N.C., 330 N.C. 761, 782, 413 S.E.2d 276, 289 (1992).  "[T]o be considered adequate in redressing a constitutional wrong, a plaintiff must have at least the opportunity to enter the courthouse doors and present his claim."  Copper ex rel. Copper v. Denlinger, 363 N.C. 784, 789, 688 S.E.2d 426, 429 (2010).

Defendants are entitled to summary judgment as to Plaintiffs' state constitutional claim. Plaintiffs have available and adequate remedies in the form of individual capacity claims such that their state constitutional claim is barred.  That these individual capacity claims are barred by public officer's immunity does not negate their adequacy as a remedy.  DeBaun v. Kuszaj, 228 N.C. App. 567 (2013); Rousselo, 128 N.C. App. at 448-49, 495 S.E.2d at 731-32.  Plaintiffs also have available a remedy in the form of their statutory claim against Sheriff Hagaman's bond. That they likewise cannot prevail on this claim does not negate its adequacy as a remedy. Finally, as Defendants note in their Reply, Plaintiffs have not attempted to refute Defendants' arguments regarding Plaintiffs' state constitutional claims.  Therefore, Plaintiffs have abandoned this claim.

IV.    **CONCLUSION**

In sum, for the reasons stated herein, Defendants' summary judgment motion is granted.

**IT IS, THEREFORE, ORDERED** that:

1.    Defendants' Motion for Summary Judgment, (Doc. No. 47), is **GRANTED**.

2.    This action is dismissed with prejudice.

---

[16]  To the extent that the Plaintiffs purport to assert any individual capacity claims under the North Carolina Constitution, such claims are barred.  Corum, 330 N.C. 761, 413 S.E.2d 276, 292-93 (1992).

3.     The Clerk is respectfully instructed to terminate this action.


Signed: May 31, 2019

Max O. Cogburn Jr.
United States District Judge